## Maynard Strickler

### v.

## James H. Marx, Sr.

Record No. 930084

November 5, 1994

Present: All the Justices

*John G. Berry (Berry & Early*, on briefs), for appellant.
*Francis McQ. Lawrence (Elizabeth Morrison; St. John, Bowling & Lawrence*, on brief), for appellee.

JUSTICE COMPTON delivered the opinion of the Court.

The dispositive question in this appeal is whether, under the circumstances of this case, the transferee of two checks qualified as a "holder," within the meaning of the Uniform Commercial Code (U.C.C.), so as to entitle the transferee to recover on the instruments.*

---

* The General Assembly made numerous changes in the U.C.C. effective January 1, 1993. Acts 1992, ch. 693. The events giving rise to this controversy predated those changes. Thus,

In March 1991, appellee James H. Marx, Sr., filed a motion for judgment against appellant Maynard Strickler seeking recovery in the amount of $11,840 with interest. This sum represents the total of two checks made in November 1981 by the defendant and eventually transferred to the plaintiff.

Following a July 1992 bench trial, the court below, in a letter opinion, ruled in favor of the plaintiff. We awarded the defendant an appeal from the October 1992 order entering judgment in favor of the plaintiff in the amount claimed.

The facts relating to the dispositive question are not in dispute. In 1981, the plaintiff, a resident of Alexandria, provided financing for a business enterprise conducted in Charlottesville by one Charles W. Davis, also known as Chuck Davis. Prior to his association with Davis, the plaintiff had incorporated Energy Technology Corporation. Davis operated A-1 Body Shop, also known as A-1 Car Body Shop, one of the entities falling under the corporate umbrella of Energy Technology Corporation. The plaintiff and Davis were also associated in another corporation that plaintiff had created, which was engaged in the used car rental business in Charlottesville.

In November 1981, defendant Strickler, a farmer living in the Charlottesville area, performed automobile repair work for Davis. Davis owed defendant money from an earlier incident in which Davis was convicted of larceny from defendant and defendant was awarded a money judgment against him.

During 1981, defendant occasionally advanced funds to Davis to meet his payroll at the end of a week so that Davis could stay in business and repay defendant the prior obligation. In the fall of 1981, defendant often left Charlottesville on weekends to officiate college football games. On these weekends, defendant would give Davis a personal check, signed and payable to A-1, and allow Davis to fill in the amount needed to meet the payroll. Davis would cash the check and repay defendant after the weekend. These transactions resulted in Davis filling in the checks for $200.00 to $300.00.

On November 27, 1981, a Friday, defendant left Charlottesville to officiate a game. He gave Davis a signed check payable to the order of "A-1 Body Shop," completed except for the amount, and drawn on defendant's account at National Bank and Trust Company. When defendant returned on the following Monday, Davis asked for

this appeal is decided under the pre-1993 version of the applicable statutes and the cases interpreting those statutes.

another check to replace the first check, stating "he messed the check up, but the bank give him the money, but he had to replace the check." On that day, November 30, 1981, defendant gave Davis another signed check payable to the order of "A-1 Car Body Shop," completed except for the amount, and drawn on defendant's account at National Bank.

Davis filled in the amount of $4,860.00 on the first check and the amount of $6,980.00 on the second check. He presented the checks to Albemarle Bank & Trust Company, where he had an account, after indorsing each, "Pay To The Order of Albemarle Bank & Trust Co. Charlottesville, Va. For Deposit Only Chuch [sic] Davis Body Shop." Apparently, Davis was given immediate credit for the checks.

The checks subsequently were dishonored by National Bank and returned to Albemarle Bank because defendant had insufficient funds in his National Bank account to pay them. Defendant routinely maintained a balance in that account of no more than $500.00. Because Davis had withdrawn the funds from his Albemarle account, the subsequent charge by Albemarle Bank resulted in an overdraft on Davis's account.

In December 1981, plaintiff learned, either from Davis or Albemarle Bank, that the two checks had "bounced." Subsequently, plaintiff and Davis executed a note payable to Albemarle Bank for approximately $15,000 to cover the amount of the checks plus other sums owed the bank by A-1. The plaintiff, who had no prior legal obligation to the bank, executed the note to protect his interest as a creditor of Davis's business.

In the spring of 1983, plaintiff paid the note without any contribution from Davis and Albemarle Bank delivered the dishonored checks to plaintiff. In addition to Davis's original indorsement, the checks carried the indorsement, "Pay Any Bank, P.E.G." by Albemarle Bank. No other indorsement, except that of the Federal Reserve System, appears on the checks.

In the meantime, defendant learned of the resulting overdrafts by notice from National Bank. He contacted Davis to find out "what was going on." Davis stated that the funds had been used to pay A-1's bills and "some outstanding debts in gambling." Davis told defendant, "I will take care of it . . . right now." Based on this representation, and after verifying with Albemarle Bank that "Mr. Davis and Mr. Marx had taken care of it," defendant took no further action. Subsequently, defendant realized that Albemarle Bank had

obtained judgments against him in the amounts of the checks. These judgments were marked satisfied when plaintiff paid the amount of the note to Albemarle Bank.

In 1985, A-1's business failed. The plaintiff testified that he "got an assignment of the assets of A-1" from the trustee in bankruptcy. No written assignment was presented in evidence nor was there testimony of the details of such assignment.

Subsequently, this action ensued against defendant only. The whereabouts of Davis is unknown. In the motion for judgment, plaintiff alleged that he "is the assignee and transferee of all assets, including claims and causes of actions, of Energy Technology Corporation, trading as A-1 Car Body Shop and A-1 Body Shop." Reciting that defendant "drew, uttered and delivered" the checks, which were "returned marked 'insufficient funds,'" and not paid by defendant's bank, plaintiff asked for judgment against defendant. The broad allegations of the motion for judgment were narrowed at trial.

At trial, the parties and the court agreed that the central issue in the case was whether the plaintiff qualified as a "holder" under the U.C.C. For example, plaintiff's counsel stated that "we concede he's not a holder in due course . . . he's a holder because he gave value. I think that a creditor that gets a cause of action on a check [has] given value. So, I think he's a holder." In addition, plaintiff's counsel stated: "He's a holder for value though, Your Honor, and we think that that puts the burden on Mr. Strickler to establish defenses." Also, at the conclusion of the evidence, the trial judge stated that the "turning point" in the case is whether plaintiff is "a holder of these two checks, and is [in] a valid position to seek to collect." The judge further said, "It's simply a matter of law under the Uniform Commercial Code, whether or not Mr. Marx can collect on these two checks." The defendant took the position that plaintiff was not a "holder." Alternatively, defendant asserted that even if the plaintiff was a "holder," defendant had established the defenses of lack of consideration and material alteration of the instruments.

The trial court, in ruling for the plaintiff, implicitly decided that the plaintiff was a "holder," although the court did not discuss the issue in the letter opinion. Instead, the court discussed its rulings that defendant had failed to prove lack of consideration or material alteration. We do not reach the question whether defendant established those defenses because we conclude that the trial court erred in ruling that the plaintiff was a "holder."

Under the provisions of the U.C.C. effective at the time of this controversy, the right of a party to payment of an instrument depended "upon his status as a holder. Code § 8.3-301." *Lambert v. Barker*, 232 Va. 21, 24, 348 S.E.2d 214, 216 (1986). (§ 8.3-301 has been replaced by § 8.3A-301.) The U.C.C. defined *"Holder"* as "a person who is in possession of . . . an instrument . . . drawn, issued or indorsed to him or to his order or to bearer or in blank." Former Code § 8.1-201(20) (now amended). "A transferee may become a holder of order paper only by 'negotiation,' that is, by indorsement and delivery, and the indorsement must be by or on behalf of a person who is himself a holder." *Becker v. Nat'l Bank & Trust Co.*, 222 Va. 716, 720, 284 S.E.2d 793, 795 (1981) (interpreting former Code § 8.3-202(1) now, with changes, § 8.3A-201). "A transfer of an order instrument without a necessary indorsement is not a negotiation." Virginia Comment to former Code § 8.3-202(1), citing *Citizens Bank and Trust Co. v. Chase*, 151 Va. 65, 69, 144 S.E. 464, 465 (1928).

In the present case, we hold that the plaintiff was not a "holder" of the checks, which were order paper, because they had not been indorsed to him or to his order or to bearer or in blank. The checks carried Davis's indorsement to Albemarle Bank and Albemarle Bank's indorsement, "Pay Any Bank, P.E.G." According to former Code § 8.4-201(2), "After an item has been indorsed with the words 'pay any bank' or the like, only a bank may acquire the rights of a holder (a) until the item has been returned to the customer initiating collection; or (b) until the item has been specially indorsed by a bank to a person who is not a bank." (The form of § 8.4-201(2) has been amended.) The plaintiff, as transferee of the checks, did not qualify as a "holder" under either (a) or (b).

At trial, the plaintiff argued that he was a "holder" simply because he received an "assignment" of A-1's assets. *Becker* demonstrates that this argument has no merit. In that case, we focused on whether a bank was a "holder" when the instruments had been transferred by mere assignment. We held that because the entity that transferred notes to the bank took them by mere assignment and not through indorsement, the entity was not a "holder" and thus could not "negotiate" the notes so as to permit its transferee, the bank, to qualify as a "holder." 222 Va. at 721, 284 S.E.2d at 795-96.

Here, as the defendant argues, the essential components of negotiation were not fulfilled by proper indorsements on the instruments. Simple delivery of the checks to the plaintiff did not give

him the status of a "holder," entitling him to the remedies of the U.C.C. The so-called "assignment" did not suffice as a substitute for indorsement. "An indorsement must be written by or on behalf of the holder and on the instrument or on a paper so firmly affixed thereto as to become a part thereof." Former Code § 8.3-202(2) (now repealed).

Consequently, the judgment in favor of the plaintiff will be reversed and final judgment will be entered here in favor of the defendant.

*Reversed and final judgment.*